# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00760-CV

---

**R. L. O., M. J. R. O., and D. O., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-003242,
### THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court terminated the parental rights of D.O. (Mother) to her daughters R.L.O. ("Reba"), who was approximately twelve years old at the time of trial, and M.J.R.O. ("Mary"), who was approximately eight years old at the time of trial.[1] Both Mother and the children have appealed the termination decree.[2] In Mother's sole issue on appeal, she challenges the sufficiency of the evidence supporting the district court's finding that termination of her parental rights was in the best interest of the children. In three issues on appeal, the children also challenge the sufficiency of the evidence supporting the best-interest finding and additionally argue that the evidence is insufficient to support the district court's

---

[1] For the children's privacy, we refer to them using pseudonyms and to their parents and other relatives by their familial relationships to each other. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] The girls have different fathers who were also parties to the proceedings in the court below. Reba's father's parental rights were terminated, while Mary's father was named possessory conservator for Mary. Neither father is a party to this appeal.

finding denying Mother conservatorship of the children and that the district court violated the children's due-process rights by limiting the time for cross-examination of certain witnesses. We will affirm the termination decree.

## BACKGROUND

The case began in April 2022, when the Texas Department of Family and Protective Services (the Department) received a report alleging the sexual abuse of Mary by Mother's romantic partner, Edin Orlando Castro-Redondo, and neglectful supervision by Mother. Department investigator Montserrat Escobio testified that during her investigation, she learned that there had been previous allegations of sexual abuse against Castro-Redondo that "were referred to Family Based Safety Services due to concerns that the family wasn't believing the child." There had also been a previous report of a "physical altercation between an adult brother in the household and Mr. Castro-Redondo." That case had closed earlier in 2022 with "[Mother] enrolling in domestic violence classes and her stating that she was being protective and not allowing Mr. Castro-Redondo in the home any longer."

During the Department's investigation, Escobio spoke with both Reba and Mary, who at the time were ten and six years old, respectively. Escobio met with Reba first, who reported that Mary had told her that she had been sexually abused by Castro-Redondo. Reba also reported domestic violence in the home, telling Escobio that "Mr. Castro-Redondo and [Mother] would fight, especially when Mr. Castro was drinking."

Escobio next met with Mary, who told her that Castro-Redondo had sexually abused her. Escobio elaborated that Mary "identified her front private part as her coquita, and stated that Mr. Castro-Redondo had touched her multiple times in her coquita." Mary also

2

informed Escobio that she had told Mother about the abuse but that Mother did not believe her. Specifically, Mother told Mary "that her nose was going to grow big if she kept lying, and that she needed to stop lying, and that it was not true."

After meeting with the girls, Escobio notified law enforcement and then spoke with Mother over the phone. Escobio "notified her that [she] had met with the children and that the children had made an outcry, so we were going to schedule emergency forensic interviews." Mother asked about the allegations and Escobio informed her that they involved Castro-Redondo. Later, when Escobio met with Mother in person, she informed her that Mary alleged that Castro-Redondo had sexually abused her. In response,

> [Mother] stated that she did not believe [Mary]; that the girls lie a lot; and that they say dumb things; and that Mr. Castro-Redondo was a good man; and that he had been with other children, specifically his stepdaughter before, and never abused her, so he couldn't have abused [Mary].

Escobio also spoke with Mary's adult brother, who "asked [Escobio] if it was still abuse if it was only a touch, and that he did not understand why a touch, you know, was such a big deal." According to Escobio, Mother "agreed" with her son.

Escobio further testified that Mother was "inconsistent" when discussing the status of her relationship with Castro-Redondo: Mother at first "said that she was no longer in communication with him" but later "stated that she only communicated with him a couple of times." Then, after the forensic interviews of the girls, "it changed to him having a key and him staying there." Additionally, Mother's initial account of the living situation was inconsistent with Mary's, who reported that Castro-Redondo lived with them.

3

The lead detective in the case was Russell Constable of the Austin Police Department. Detective Constable testified that he observed Mary's forensic interview and that during the interview, Mary made an outcry of continuous sexual abuse by Castro-Redondo and stated that she had told Mother and Reba about the abuse. Constable later went to the girls' home and spoke with Mother, who told him that Castro-Redondo "didn't live there; he lived with a friend." However, when the police searched the apartment, they found men's clothing in the master bedroom.

After the forensic interviews of the girls, Escobio spoke with Mother again, this time accompanied by two APD detectives. Mother "stated that she was innocent because she was not aware of the allegations," but "she cooperated with what the detectives were asking." Specifically, Mother "agreed to allow APD to go into her apartment to get the pajamas that [Mary] had last reported she was using" and accompanied Escobio, the detectives, and the girls to the hospital for a SANE (sexual assault nurse examiner) examination of Mary, who requested that Mother not be present in the examination room during the exam.

After Mary's examination, Mother refused to sign a release of information to provide the SANE records to law enforcement, despite being asked to do so by both the hospital and Escobio. This concerned Escobio "[b]ecause [Mother] was still protesting—protecting Mr. Castro-Redondo, and said that he was innocent, and she was not going to move forward with . . . an investigation on him." Escobio opined that Mother "still did not believe [Mary], despite the amount—you know, however many conversations we had about it." Detective Constable also expressed concern about Mother's refusal to sign the release:

4

> So, I mean, generally when we're doing a SAFE exam,[3] I receive consent from a parent. You know, most parents are wanting to know . . . the results and to see what happened.
>
> I hadn't had—at that point, I had not had any parents refuse to sign the consent, or been informed that a parent refused to sign the release. And I have yet to have another one since I've been a detective.

After the SANE exam, the Department decided to conduct an emergency removal of the children from Mother. Escobio testified that the removal upset both girls, who believed they were at fault for the removal.

In December 2022, police interviewed Reba a second time. This time, Reba reported that she, too, had been sexually abused. Constable testified:

> So during that point, she made outcries of sexual abuse by two different people. One was by an uncle [Mother's brother]. She was much younger. That incident was reported to have been physical contact, penis to vagina.
>
> And then the second outcry was against Mr. Castro[-Redondo]. And that one involved penetration of – of her anus with his penis, and also touching of his hands in her vagina.

Constable added that Reba characterized Castro-Redondo's abuse as continuous. Constable testified that Castro-Redondo was arrested, charged, and convicted of continuous sexual abuse of Reba and Mary.

---

[3] SAFE stands for sexual assault forensic examination. At trial, the parties used the terms SANE exam and SAFE exam interchangeably.

The children were placed with Michelle Beckham beginning in February 2023.[4] The children lived with Beckham until August 2023, when the children were returned to Mother on a monitored basis, and then they lived with Beckham again for approximately six months in 2024, after the monitored return failed due to Mother allowing Castro-Redondo to speak with the children over the phone from jail, coaching the children to recant their outcries, and the children not attending therapy consistently while in Mother's care. Beckham testified that when the children first came into her care, Mary was very outspoken while Reba was quieter and more emotional. Beckham recounted that Mary would often talk about the sexual abuse that she experienced. The girls had a close relationship with each other and "very well bonded to each other," with Reba acting in more of a "caretaking" role.

While in Beckham's care, Reba made an outcry that Mother had physically abused her. Beckham recounted:

> She had had a phone call with Mom, and I observed her to be in distress. And after the phone call I asked her if she was okay. And she said that she was—she, you know, had been upset about the phone call. And then she proceeded to talk about—that her mom would hit her a lot. And she had said that one time Mom got so angry that she slammed her face into the sink and made her nose bleed.

Beckham continued:

> She would say that Mom sometimes would just get really mad and would just hit her, hit her, hit her, and wouldn't—wouldn't stop, and that she felt like Mom would just kind of almost black out, and just—so she—she talked about that a lot.

---

[4] The children had been placed in another foster home before being placed with Beckham. The record does not contain detailed information about the initial placement.

And she talked about witnessing domestic violence between Eddie and Mom, and that he would be assaulting her—assaulting Mom, and that she would—she would witness that. She also talked about a couple of times witnessing Mom hitting [Mary].

Reba also talked to Beckham about the sexual abuse that she experienced. Beckham explained that the first conversation arose after she discovered pornography on Reba's phone, and Reba told her that Castro-Redondo made her look at the pornography and then would proceed to sexually abuse her. Reba also told Beckham that Mother had given her the phone.

Beckham further testified that after visits with Mother, Reba "was unsettled and a little bit more anxious, a little bit more tearful. She would be withdrawn for a while. And then she would come out of her room and want to talk." Beckham added that there were times when Reba indicated that she missed Mother. Beckham recounted that when the girls were placed back into her care following the failed monitored return, they changed: Mary "did not display near the personality that she did the first time. She was very stoic, somewhat angry," while Reba "was completely shut down."

The children continued to have visits with Mother. Beckham testified that after the first visit following their return to Beckham, "both children were extremely emotional" during the car ride home, and Reba announced, "I don't want to see my mom anymore." Beckham "asked her why not, and she said because her mom had been telling her that she had to take back what she had said about her having been sexually abused by [Castro-Redondo]." Additionally, "she had said that she had—was forced to talk to him on the phone." Reba "was shaking and crying" when she told Beckham this, "so much so that [Beckham] ended up pulling over." Mary, who was also in the car at the time, "echoed that Mom had told her that she had to—that she had to say that nothing happened so that they could get him out of jail."

7

Reba had other behavioral issues following the failed monitored return to Mother. Reba was caught with a "THC vape pen" at school, which Reba indicated she got at Mother's house. Reba also told Beckham "that she had been using THC marijuana just about daily while she was at Mom's house" and that Mother "told her to steal things from the store." Additionally, Beckham testified that "[t]here was a lot of lying," and "[t]here was hypersexuality regarding a boy that she was interested in."

Beckham allowed Reba to create a TikTok account. Beckham monitored it and observed that Mother had friended Reba. On Mother's profile, "within the last month" before trial, Beckham "saw recent photos that had been posted of Edin, who is the perpetrator to the girls." The photos concerned Beckham because "they were posted in a fashion that was—that was missing him and romanticizing him. And then that person has now been convicted of sexually abusing these children." This caused Beckham "a lot of concern" about Mother's "level of protectiveness."

Beckham further testified that she was no longer the foster placement for the girls because she believed it was in their best interest "to be in a two-parent home that would provide them more—you know, everything that they need and deserve, that myself, being a single parent, may not be able to do." The children's current placement was with a foster family that lived in the same neighborhood as Beckham in Georgetown. Beckham explained that the girls were familiar with this family:

> They met that family when they were placed with me the first time. The foster care community is pretty small. We all, you know, have play dates with kids. And this was a family that had had—previously had a foster child that was the same age as one of my previous foster kids. And so I met them at the daycare. And they also lived down the street.

So when all the neighbor kids would come out, you know, they would be out. We would be out. All of our neighbors. And so that's how they—that's how they became familiar with them.

The children had been placed with the foster family on July 17, 2024. The foster mother, L.E. (Foster Mother), testified that it was her plan, hope, and desire to adopt the girls. Foster Mother testified primarily about statements that Reba and Mary had made to her following a visit with Mother. Foster Mother recounted that Reba told her more details regarding the sexual abuse:

> She also shared that when the abuse started by Mr. Castro Redondo—the sexual abuse—that it became daily and that sometimes he would keep her home from school in order to have sex with her all day long.

> She said that she did not initially report her sexual abuse because she did not want to get her mother in trouble.

> And it wasn't until her—she became aware that her sister was also being abused by Mr. Castro-Redondo that she—she outcried about that. She said it was because she wanted her sister to not miss out on being a little girl.

> She said that her mother did not believe them and that she thought they were making it up. [Reba] seemed confused by the idea that she could make up something like this, as they were so young, and how would they know.

Foster Mother continued:

> She also talked about—that she, [Mary], her mother, and Mr. Castro-Redondo also shared a bed at certain times, and that [Reba] preferred to sleep in the corner, as far away from him as possible.

> But when she realized that he was making [Mary] sit—sleep next to him, she encouraged [Mary] to use the corner instead.

9

Foster Mother also recounted that approximately one week after the visit with Mother, Reba reported having suicidal thoughts after Mother told Reba that because of the Department proceedings, "things were bad for [Mother]."

Foster Mother further testified that Mary made an outcry to her that she had been physically abused by Mother:

> She also spoke about—that her mother would hit her for what seemed to her like no reason, as though—like, it didn't matter what she said or did . . . her mother didn't believe her. She would hit her. She was—specifically recalled a time when her mother took a belt and hit her repeatedly on the back of the legs.

> She said that her and her sister recognized that her mother was less likely to hit one of them if they were both present in the room, so she would often try to get them alone. So—[Mary] said she remembers trying to stay in the room to try to prevent [Reba] from being hit at times. She expressed that she did not trust her mother.

Mary also told Foster Mother that during the monitored return, Mother made her speak to Castro-Redondo over the phone:

> She spoke specifically about when she was reunified with her mother, that her mother would accept calls from Mr. Castro-Redondo and make her speak to him. She said she did not want to speak to him, so all she would say was hi, but that he would talk to her and say how much he missed her.

Additionally, Mary told Foster Mother that Mother was planning on reuniting with Castro-Redondo upon his release from prison and leaving Mary behind:

> [Mary] also said that her mother had told her, while she was reunified with her, that when Mr. Castro-Redondo was released from jail and returned to Honduras that she planned to return, as well, to be with him, and that [Mary] would be left with a lady who lived in their apartment.

10

Foster Mother added that Mary also told her that Mother had once called Reba "trash" after Reba got in trouble at school.

The district court also heard testimony from three therapists who had been assigned to the case. Mother's therapist was Benita Bonnie DeLeon-Hernandez, who first began meeting with her in January 2023 and continued meeting with her consistently throughout the case. DeLeon-Hernandez testified that one issue that she addressed with Mother during therapy was "protectiveness of both of her children due to an outcry of sexual abuse by [Mother's] partner." DeLeon-Hernandez testified that during the therapy sessions, Mother struggled with believing that the abuse had occurred and often exhibited defensiveness, a lack of empathy, and a consistent pattern of "deflecting" discussions away from the abuse. Mother also expressed frustration when asked to discuss her relationship with Castro-Redondo.

As of May 2023, DeLeon-Hernandez believed that Mother was no longer having contact with Castro-Redondo. However, in July or August 2023, DeLeon-Hernandez received from the Department copies of recorded jail calls between Mother and Castro-Redondo. When DeLeon-Hernandez confronted Mother about the calls, Mother stated "that it wasn't her making the calls, that she didn't have contact" with Castro-Redondo. Later, Mother discussed the contents of and the reasons for the calls, which DeLeon-Hernandez interpreted as an indirect acknowledgment that Mother had contact with Castro-Redondo.

Eventually during their sessions, it appeared to DeLeon-Hernandez that Mother "understood the information in the outcry," but Mother never directly acknowledged to her that the outcries were true. During the period when the children were returned to Mother, Reba recanted her allegations against Castro-Redondo, which DeLeon-Hernandez suspected might have been the result of coaching by Mother. DeLeon-Hernandez observed that following the

11

recantation, Mother "was confused," "wasn't certain of what to believe," and "regressed" in terms of her empathy and protectiveness. This regression included an apparent lack of concern regarding Reba's contact with Castro-Redondo that Mother had facilitated. DeLeon-Hernandez noted that in January 2024, Mother indicated at a court hearing that she believed the abuse had occurred, but in March 2024, during a therapy session, Mother again denied that the abuse had occurred. At the time of trial in September 2024, DeLeon-Hernandez remained concerned about Mother's regression and her defensiveness. Mother continued to deny the outcries that her daughters had made: "[Mother] stated that those things did not occur," and Mother continued to characterize the girls as dishonest. DeLeon-Hernandez also expressed a concern that Mother had coached Reba on her recantation.

Carla Valdivia was Reba's therapist beginning in May 2023. Valdivia testified that during their weekly therapy sessions, Reba demonstrated "some avoidance—a lot of avoidance, I guess I would say, when it came to—when it came to the sexual abuse" that she suffered. However, "once she felt a lot more safe and comfortable, she talked a bit about her relationship with her mom, and how that relationship was—she wanted it to be better." Valdivia elaborated that Reba "wanted a relationship with Mom" and focused on "the things that they did together, the girls and Mom." However, Reba also expressed to her that "things were lacking" in her relationship with Mother, such as "communication" and "understanding." Valdivia added that Reba mentioned that Mother had physically abused her. Valdivia explained, "She didn't really kind of—she wasn't very specific about the physical abuse. It was just more of a feeling of, like, not—not entirely safe and happy with Mom, but wished that improved." Valdivia further testified that when Reba was in foster care, she attended therapy consistently. When

12

Reba was returned to Mother's care, the therapy sessions became inconsistent, in part due to transportation issues involving Mother, and Valdivia stopped seeing Reba in November 2023.

Robyn Urive was a therapist for both children and saw them from March through July 2024. Urive testified that Mary, at the beginning of their therapy sessions, expressed a desire to live with Mother and "definitely had a bond with her mother." However, towards the end of therapy, Mary "didn't even want to see her mother." Urive explained that she did not think Mother "did anything specifically" to make Mary feel that way but that Mary "just felt defeated" by the custody situation involving both her parents.

Regarding her therapy sessions with Reba, Urive testified that Reba discussed being sexually abused at a young age first by her uncle and then by Castro-Redondo. However, Reba "would often say that she's not mad at her mom" for the abuse, and she "forgives her and she loves her." Urive explained that Reba "loves [Mother] mother very much" and "has a very strong bond with her mom." Urive added, "If she could choose to be with anybody, then that's—she expressed that her mother is the person." According to Urive, although Mary's mind had changed back and forth about wanting to be with Mother, Reba "has been pretty consistent" about wanting to be with Mother.

Urive further testified that she talked with Reba "a lot" about "advocating for herself," "how to set healthy boundaries," and "how to have healthy communication with Mom," but one thing she remembered "both of the girls sharing was that it was kind of difficult to have these kind of conversations with their mom, so they often wouldn't have, I guess, the more challenging conversations with her." Urive thought that Mother just "wasn't willing to engage in those conversations, and so they just learned to kind of suppress a lot of things." Urive added

13

that although she believed the girls "had protective, healthy boundaries with their mother," the girls "maybe [did] not with the other people in the household."

Justin Johnson was the current Department supervisor of the case. He testified that at the time of trial, Mother had engaged in most of her court-ordered services and was still engaged in individual therapy. Despite Mother having engaged in her services, the Department continued to have concerns with Mother's ability to protect the children. Johnson explained:

> Throughout the life of this case, the Department has had concerns with [Mother's] ongoing contact with the perpetrator in this case, Mr. Edin Castro-Redondo. The Department has had concerns with [Mother's] lack of understanding of why that is harmful to her children. The Department has remained concerned with [Mother's] lack of protectiveness and willingness to protect her children from the perpetrator in this case. And then the Department has remained concerned with [Mother's] inability to validate and support the children's emotional and therapeutic needs throughout this case.

Johnson testified that the Department had spoken with Mother "throughout the case" about the Department's concerns and had provided copies of her jail calls with Castro-Redondo to Mother's therapist so that Mother's continued contact with Castro-Redondo could be addressed in individual therapy.

Johnson also testified regarding the monitored return of the children to Mother in September 2023 pursuant to a Mediated Settlement Agreement between the parties. Johnson testified that concerns arose during the return, including that the conditions outlined within the agreement were not being followed. Specifically, Mother had allowed Reba to have direct contact with Castro-Redondo. Additionally, Mother did not ensure that both girls remained in individual therapy throughout the return, which was important because "both girls . . . are victims of horrible abuse, and therapy is a part of how to help them move forward, help them

14

heal, and help them cope with what they have experienced." Finally, the Department was concerned that Mother was coaching the girls to recant their outcries of sexual abuse and change "their perspective towards the perpetrator." Due to these concerns, the monitored return ended in January 2024.

The Department's concerns remained unaddressed at the time of trial. Johnson explained:

> At this point, the Department has not seen a change in [Mother's] understanding of how her actions throughout the case have put her daughters in danger or at risk of being in danger, and how it has been – and really we haven't seen her make improvements in her protectiveness throughout this case at this point.

Johnson continued:

> [Mother] has allowed her—her children to have direct and/or indirect contact with the perpetrator during a return and monitor. And she has continued to demonstrate a pattern of not believing her children's outcries of sexual abuse throughout this case. And we have seen a lack of progress in individual therapy to—in addressing her understanding of—of what it means to be a protective caregiver and her willingness to be a protective caregiver in the future.

Johnson also believed that Mother's conduct had endangered the children. He explained:

> [Mother] allowed her daughters to be—she allowed Mr. Castro-Redondo to live with her daughters, despite knowing that there was previous involvement with the Department, despite already telling the Department in a previous case that she would not allow him to be in the home just a few months before this case opened up, because of the concerns—the concerning behavior that he was displaying around the children.
>
> And then throughout this case, she again allowed her daughters to be—to have direct and/or indirect contact with this same person, despite a year and a half of engagement in services and working towards addressing these concerns.

15

Johnson further testified that the Department's plan for the children if Mother's parental rights were terminated was for Reba to be adopted by her current caregiver and for Mary to eventually achieve permanency with her father, who the Department was seeking to be named as Mary's possessory conservator. Johnson explained that the Department had created a service plan for Mary's father "to work towards family reunification with him, as long as he's willing to engage in the services within that service plan."[5]

Johnson acknowledged that the Department's position on the first day of trial was for Mother and the Department to share custody of the girls and that the plan changed to termination before the second day of trial.[6] Johnson explained that the plan changed because Mother "was no longer willing to engage in the service plan that had been offered to her," which included an updated psychological evaluation. Johnson believed that termination of Mother's parental rights was in the best interest of the children. When asked to explain why, Johnson testified:

> As far as—well, ongoing contact with [Mother] is unsafe. It is harmful to their emotional and physical wellbeing. And having her rights terminated will—one, it will sever that relationship. And, second, it will allow [Reba] to exit the—foster care and be adopted by her current caregiver, which will allow her to continue to work towards healing and just moving forward from all the—just the harm that she has experienced.
>
> And same for—for [Mary]. It would allow her to, I think, be much more safe, and be able to move forward in her own therapeutic healing, as well, at this point.

---

[5] Johnson testified that Mary's father was currently living in Honduras. Earlier in the case, Mary's father had resided in Austin.

[6] We note that approximately two months elapsed between the first day of trial on July 15, 2024, and the second day of trial on September 10, 2024. The remainder of trial was held on September 11, September 13, and October 11, 2024.

Melissa Leal, the children's guardian ad litem since shortly after the case began, testified that her primary concern at the beginning of the case was the girls' allegations of sexual abuse and "making sure that the abuser was out of their lives and that the mother could under—gain an understanding of, I guess, safety in the home, and protectiveness, and understanding their trauma, as well." Leal added that additional concerns arose as the case progressed:

> I was very concerned about the relationship that [Mother] had with the alleged perpetrator. And then as the case progressed, I was also concerned about outcries of physical—or extreme corporal punishment in the home, and also the parentification that seemed to be going on with [Reba] for [Mary]. So that was— that was a concern that built as we learned more through the case.

Leal reviewed the court orders in the case and testified that she agreed with them, including the order that Castro-Redondo have no contact at all with the children, directly or indirectly. In January 2023, after Castro-Redondo had been arrested for the offenses, Leal spoke with Mother over the phone about the importance of the no-contact requirement, and Mother indicated that she understood: "And her response to me was that she had not had any contact and that she didn't have any desire to have any contact and that she knew that that contact was against the Court orders, or something to that effect." After that, Leal began working with the Department to expand Mother's visits with the children.

However, Leal later learned "that there were over 100, maybe even 180 phone calls that had been made from the alleged perpetrator, that included calls to [Mother], over the course of his incarceration." At that point, Leal "realized that [Mother] had not only been dishonest over the period of his incarceration regarding contact but that she had been directly dishonest with me in a direct call." After that discovery, the district court ordered that "the jail

17

calls between the Respondent Mother and the perpetrator, Edin Castro-Redondo, be provided to Respondent Mother's therapist in order for therapeutic intervention to be provided."

As the case moved toward the monitored return of the children to Mother, Leal was concerned that "it might be happening too soon" and "whether or not [Mother] had made enough progress, as to empathy, protectiveness, putting the girls first, and making the girls a priority, as opposed to her own need." Despite these concerns, Leal was "sort of hoping that with the continued work with [Mother's therapist] that—that we would continue to see progress." Leal testified that the monitored return included several conditions designed to protect the children, including that "there should be absolutely no contact" between the children and Castro-Redondo.

After the children were returned to Mother, Leal became concerned that "within two to three weeks . . . [Reba] recanted her outcry," and Mother's therapist expressed concerns "about coaching and the environment that the girls were in at home." Additionally, Mother allowed Castro-Redondo to speak with Reba over the phone. Leal explained that the return failed because of "the contact that was allowed between [Reba] and Edin Castro-Redondo, and the seemingly lack of understanding as to why that was—or why that demonstrated a lack of protectiveness or why that was harmful to the—to the child." The timing of Reba's recantation, shortly after the children had been returned to Mother, also concerned Leal, as did Mother's having to be ordered by the court to refrain from contacting Castro-Redondo. Leal explained, "It was a concern because that should have been very obvious to any mother, that her children should not have contact with the man who was their sexual abuser, or was accused of sexually abusing them." In Leal's view,

18

[I]t demonstrates a lack of understanding. It—understanding of what that man was capable of. It diminishes the trauma that her children experienced, and seems to ignore it, if—for lack of a better description. And because it is not common for—I should say a parent who is protective is not going to engage in a relationship with a man who is accused of—of sexually abusing her children.

Other concerns that arose during the return included the children not attending therapy regularly and academic issues regarding Reba. Leal learned that during the return, Reba "was skipping classes," "fighting at school," and "failing four out of six classes." Regarding therapy, "based on the failure to attend and the failure to be responsive to the therapist's attempt to reengage them," Leal believed that Mother "did not make it a priority" and "did not think that her children needed it."

Leal believed that termination of Mother's parental rights was in the best interest of the children. She opined that the "multiple incidents of abuse and neglect" that occurred in Mother's household demonstrate "the children are at risk, were at risk, continue to be at—will be at risk if they are returned to their mother." She elaborated:

Setting aside the biggest issue, which was the sexual abuse of both of these girls at very young ages, under—under the same roof as the mom, the parent continuing to engage in a relationship with that particular abuser—In my opinion, she has had the opportunity to address and build understanding of the trauma her children have—have experienced, and has had access to resources and services to become a better parent. And she has not demonstrated change in the way that, at this point she should have, to be a safe and protective parent.

Although Leal agreed with the Department that Mother's parental rights should be terminated, she disagreed with the Department regarding the parental rights of Mary's father. Leal believed that his parental rights also should be terminated so that Mary could be adopted by her current placement. Leal explained that although she initially supported the relationship

19

between Mary and her father, he had failed to consistently visit Mary, scheduling visits and then canceling them. This became very difficult on Mary, who would be excited to see him and then "disappointed when those visits didn't happen."

Leal further testified that she had visited the children in their current placement and that both girls were "thriving" there and "have adjusted really well to the home." Leal had no concerns about the care the children were receiving in their current placement and testified that "all of their needs are being met" there. Leal saw the placement as "a safe and comfortable place" for Reba, who "was working really hard at school" and "doing much better" academically, making As and Bs in her classes. Leal attributed this to Foster Mother being "a teacher by training." After school, Reba was engaged in math tutoring and cross-country running, supported by her foster father, who was also a runner. Additionally, Reba was "consistently meeting with her new therapist on a weekly basis," which, "[f]rom all reports," "seems to be going well." Leal acknowledged Reba's past suicidal ideation and testified that this was being addressed in an after-care program through Bluebonnet Counseling, which was teaching Reba skills in "dealing with emotions, and building coping mechanisms, and looking for ways to avoid negative talk and self-harm." Mary similarly had "adjusted and transitioned really well" to the new placement, was "comfortable and seems very happy in the home," and was "doing really well academically." After school, Mary was reading, taking swimming lessons, and "meeting weekly with her individual therapist," who was teaching her skills similar to those that were being taught to Reba.

At the conclusion of trial, the district court noted that it had visited with Reba and Mary individually before the fourth day of trial one month earlier and received "statements on their thoughts about what they would like to happen." The district court recounted, "[Reba] said

she wants to go home to her mom now. She does not want her rights terminated. And [Mary] said she is not exactly sure, but she does not want anything to change how they are now." The district court then announced that it was taking the matter under advisement.

The district court later issued its final decree of termination, finding by clear and convincing evidence that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, *see* Tex. Fam. Code § 161.001(b)(1)(E), and that termination of Mother's parental rights was in the best interest of the children, *see id.* § 161.001(b)(2). Based on these findings, the district court rendered judgment terminating Mother's parental rights to Reba and Mary.[7] This appeal by Mother and the children followed.

**STANDARD OF REVIEW**

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick*

_____

[7] The decree also terminated the rights of Reba's father to Reba, named Mary's father a possessory conservator for Mary, and appointed the Department as non-parent sole managing conservator of both children.

21

*v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.*

22

"Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

## DISCUSSION

**Best interest**

In Mother's sole issue on appeal, she asserts that the evidence is legally insufficient to prove that termination of her parental rights is in the best interest of the children. In the children's second issue on appeal, they assert that the evidence is factually insufficient to prove that termination of Mother's parental rights is in the best interest of the children.

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see*

23

*A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Evidence in the record both supports and is contrary to the district court's finding that termination of Mother's parental rights is in the best interest of the children. The evidence in support of the finding includes evidence showing that:

- Castro-Redondo had sexually abused Reba and Mary continuously but Mother chose not to believe her daughters when they reported the abuse; instead, she called them liars;

- Mother was "inconsistent" when describing to officers and the Department investigator the status of her relationship with Castro-Redondo;

- After Mary was examined at the hospital, Mother refused to sign a release of information to provide the SANE records to law enforcement, which indicated to the Department investigator that Mother was attempting to protect Castro-Redondo, more so than her daughters.

- According to Reba, Castro-Redondo was not the first man who had sexually abused her; she also had been sexually abused by Mother's brother when she was younger;

24

- Reba reported that Mother "would hit her a lot," one time getting "so angry that she slammed her face into the sink and made her nose bleed";

- Mary also reported that Mother hit her repeatedly, including with a belt, "for what seemed to her like no reason";

- During the monitored return of the children to Mother, Mother made the children have contact with their abuser despite a court order that they have no contact with him;

- Mother coached the children to recant their outcries, and Reba at one point did so;

- Beckham observed that Reba had behavioral issues following the failed monitored return to Mother;

- In 2023, Mother had multiple phone calls with Castro-Redondo while he was in jail and may have continued to romanticize him in 2024 on her TikTok account, which Beckham discovered approximately one month before trial;

- Mother told Mary that when Castro-Redondo was released from jail, she planned to return to Honduras with him and leave Mary behind with a lady who lived at Mother's apartment;

- There was domestic violence in Mother's home between Mother and Castro-Redondo that Reba witnessed and a report of a physical altercation between the children's adult brother and Castro-Redondo;

- Mother's therapist testified that Mother struggled throughout the case in believing her daughters' outcries and often exhibited defensiveness, a lack of empathy, and a consistent pattern of "deflecting" discussions away from the abuse; Mother also lied to her therapist about her continued contact with Castro-Redondo while he was in jail;

- The children's therapist testified that Mother was not willing to engage in conversations with her daughters regarding the abuse and that as a result, the children "just learned to kind of suppress a lot of things";

25

- During the monitored return to Mother, the children did not attend therapy consistently;

- The Department's concerns regarding Mother's protectiveness remained unaddressed at the time of trial; it had not seen a change in Mother's understanding of how her actions put her daughters at risk;

- The guardian ad litem similarly testified that Mother had not demonstrated by the time of trial that she could be "a safe and protective parent";

- The children were currently placed with a foster family with whom they were already familiar and that wanted to adopt them, and the children were "thriving" in the placement.

In sum, the evidence showed that Mother did not believe the children when they reported the sexual abuse and still did not believe them at the time of trial, forced the children to speak with their abuser over the phone while he was in jail and encouraged them to recant their allegations against him, and was herself violent with the children. Additionally, the children were currently placed with a foster family that wanted to adopt them, in a home where they were "thriving," improving academically, and receiving much-needed therapy that they had not received consistently while in Mother's care. Viewing the totality of this evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that terminating Mother's parental rights was in the best interest of the children. Accordingly, the evidence is legally sufficient to support the finding. We overrule Mother's sole issue.

The evidence contrary to the best-interest finding includes evidence showing that neither child wanted Mother's parental rights terminated; that both children were bonded to Mother; that Reba told her therapist that she wanted a better relationship with Mother; and that

26

Mother had completed most of her court-ordered services and had attended her visits with the children consistently. Also, there was no indication in the record that Mother had unstable living or employment conditions at the time of trial or that she had any contact with Castro-Redondo after the monitored return had failed.

Moreover, the future placement of the girls was uncertain. The girls were not placed with their current placement until July 2024, approximately three months before trial concluded, which reduced the window of time available to evaluate whether the placement was in the girls' best interest. Foster Mother testified that she wanted to adopt the girls, but the Department testified that although its plan for Reba was adoption by the current placement, its plan for Mary was "to work towards family reunification" and achieve permanency with her father. Thus, if the Department's plan came to fruition, the girls would be separated from each other, which could be contrary to their best interest because the girls had a close relationship and, according to their former foster placement, were "very well bonded to each other." *See In re De La Pena*, 999 S.W.2d 521, 535 (Tex. App.—El Paso 1999, no pet.) ("Where it is possible for siblings to be kept together and reared as a family, it is not in the best interest of the children that they be separated.").

This evidence is not "so significant" that it outweighs the evidence supporting the district court's best-interest finding summarized above. A child's desires or wishes is a "very important consideration" in determining the best interest of the child, but "it cannot override or outweigh evidence of danger to the child." *In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). In this case, there was evidence that Mother had endangered her children, both by physically abusing them and by forcing them to speak with the man who had sexually abused them. Additionally, although the children's therapist testified that

Reba has been "pretty consistent" throughout the case about wanting to be with Mother, Mary's mind had changed back and forth about wanting to be with Mother, at one point telling her therapist that she "didn't even want to see her mother." Even Reba, who was most consistent in wanting to return to Mother, told her former foster placement following one visit with Mother, "I don't want to see my mom anymore." The district court could have reasonably inferred from this evidence that the girls had complicated feelings about Mother and that preserving Mother's parental rights would not necessarily give the children what they wanted.

As for Mother's progress in the case, despite complying with other services, she had not completed her individual therapy, and Mother's therapist remained concerned at the time of trial about Mother's regression in not believing her daughters' outcries and continuing to characterize the girls as dishonest. And although Mother had consistently attended her visits with the children, the district court could have placed greater weight on the failure of the monitored return of the children to Mother.

Finally, regarding the uncertainty of the children's placement, the supreme court has explained that "the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor" in a best-interest inquiry; "otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id*.

In this case, Foster Mother testified that she wanted to adopt the children, and even if adoption was uncertain at the time of trial, the district court could have reasonably found

that this was a beneficial placement for both children based on the testimony of the guardian ad litem, summarized above. Moreover, Mary's father was currently residing in Honduras, and the district court could have determined that even if the court appointed him possessory conservator, it was likely that Mary would continue living with the current placement (and thus with her sister) for the foreseeable future and that this would be in Mary's best interest.

In light of the entire record, we cannot conclude that the disputed evidence contrary to the best-interest finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. Accordingly, the evidence is factually sufficient to support the best-interest finding. We overrule the children's second issue.

**Conservatorship**

In their first issue on appeal, the children assert that the "parental presumption," i.e., the rebuttable presumption that appointing a parent as conservator is in the best interest of the children, should apply to Mother because the evidence is factually insufficient to support a finding that appointing Mother as conservator would "significantly impair the children's physical health or emotional development," a finding that is necessary to overcome the parental presumption. *See* Tex. Fam. Code § 153.131(a), (b). However, because Mother's parental rights have been terminated in the court below and we are affirming the termination of Mother's parental rights on appeal, the parental presumption and other statutory provisions relating to parental conservatorship do not apply here. *See id*. § 101.024(a) (providing that term "parent," as used in family code, "does not include a parent as to whom the parent-child relationship has been terminated"); *T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471, at *10 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.) (parental

29

presumption "disappears when a parent's rights to their child have been terminated"); *T.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00351-CV, 2014 WL 6845198, at *5 (Tex. App.—Austin Nov. 25, 2014, no pet.) (mem. op.) (explaining that family code provisions "create a statutory preference for placement with a parent while a parent still retains her parental rights").

We overrule the children's first issue.

**Cross-examination of witnesses**

In the children's third issue, they assert that the district court violated their due-process rights by limiting the amount of time they had to cross-examine Department case supervisor Johnson and Foster Mother, the last two witnesses to testify at trial. Immediately before Johnson testified, the record reflects that the following occurred:

| | |
|---|---|
| [The court]: | In an effort to keep you-all finished on your time, I'm going to give each side 30 minutes to do the examination and cross-examination of the next witness. Which is [Johnson], correct? |
| [Department counsel]: | Yes, Your Honor. |
| [The court]: | And then I—and then I'll have [Foster Mother], which I will— |
| [Department counsel]: | Yes. |
| [The court]: | Okay. We'll also split some time on that, too. I want to get you-all finished today. Want you to finish the rest of your time. |
| [Mary's father's counsel]: | I apologize. Could you clarify, Your Honor? 30 |

30

| | |
|---|---|
| | minutes for [Johnson] and [Foster Mother] on each side or— |
| [The court]: | No. 30 minutes for [Johnson]. I'm going to split 30 minutes for [Foster Mother]. So we'll do an additional 30 minutes. We are going to have to go past 5:00, unless you-all go faster than your 30 minutes. But we are at 4:10. |
| | All right. So call your next witness, [Department]. |

The children argue on appeal that the district court's time limits prevented their attorney ad litem from effectively cross-examining the witnesses.

However, the record does not reflect that the children's attorney ad litem raised this complaint in the court below. Instead, it is being raised for the first time on appeal. Accordingly, the error, if any, in not allowing more time for cross-examination of these witnesses has not been preserved for our review. *See* Tex. R. App. P. 33.1(a); *J.E. v. Texas Dep't. of Fam. & Protective Servs.*, No. 03-14-00164-CV, 2014 WL 4536569, at *4 (Tex. App.—Austin Sept. 10, 2014, no pet.) (mem. op.) (applying error-preservation requirement to time limitations imposed by trial court during termination trial); *see also In re Harrison*, 557 S.W.3d 99, 127 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (party failed to identify "where she objected to the trial court's imposition of time limits" and "therefore has preserved no error regarding the trial court's enforcement of the time limits to which [she] did not object").

We overrule the children's third issue.

**CONCLUSION**

We affirm the district court's termination decree.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis and Crump

Affirmed

Filed:   May 15, 2025